IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| MICHAEL R. BENNETT, | ) | |
|---|---|---|
| Petitioner, | ) | |
| | ) | 1:10CR45 |
| v. | ) | 1:11CV760 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Michael R. Bennett has brought a Motion (Docket Entry 87)* to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. Respondent has filed a Response (Docket Entry 96) asking that the Motion be denied. Petitioner filed a Reply. (Docket Entry 101.) The matter is now before the Court for a ruling. *See* Rule 8, Rules Governing Section 2255 Proceedings.

### Background

Pursuant to a written plea agreement (Docket Entry 3), Petitioner pled guilty to three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One, Fourteen, and Fifteen), and one count of making a false statement, in violation of 18 U.S.C. § 1001(a)(3) (Count Twenty-One). (2/18/2010 Minute Entry.) In changing his plea, Petitioner agreed under oath that the following Factual Basis was true:

---

* This and all further cites to the record are to the criminal case.

### A. Department of Transportation

The United States Department of Transportation (DOT) mandates that certain aviation, trucking, pipeline and other employees engaged in interstate commerce be tested for use of various banned controlled substances in order to ensure public safety. The DOT has issued regulations pursuant to 49 C.F.R. 40.1 *et seq* which govern the administration, evaluation and reporting of drug screening tests.

The regulations allow employers of transportation workers to conduct drug screening tests with the aid of consortium/third party administrators (C/TPA) who coordinate the drug screening process.

Drug screening of transportation employees begins with the collection of urine specimens by collectors meeting federally mandated training requirements. The collector obtains the urine specimen from the donor and completes a Federal Drug Testing Custody and Control Form (CCF) before the specimen is shipped to a laboratory certified by the United States Department of Health and Human Services. The CCF must list the name and address of a Medical Review Officer (MRO) designated by the employer or by a C/TPA selected by the employer.

A MRO is a licensed physician specially trained in substance abuse, who is responsible for receiving and reviewing lab tests. The CCF must identify a MRO because the lab, under federal law, can only report the testing result to a MRO and not to the employer or the C/TPA agent of the employer.

The MRO then evaluates the test and if the test is nonnegative must contact the donor employee to conduct an interview to determine if any medical reason, including medication, might explain the non-negative test result. The C/TPA cannot transmit the drug test results from the lab directly to the employer without a MRO evaluation.

### B. Workplace Compliance, Inc.

MICHAEL R. BENNETT founded WORKPLACE COMPLIANCE, INC., in 1996 while residing in the State of

Texas. On March 7, 2001, MICHAEL R. BENNETT incorporated WORKPLACE COMPLIANCE, INC., in the State of North Carolina and was listed as the registered agent. In later filings with the Secretary of State, MICHAEL R. BENNETT is listed as President of WORKPLACE COMPLIANCE, INC.

MICHAEL R. BENNETT and WORKPLACE COMPLIANCE, INC., represented to employers and background screening companies that WORKPLACE COMPLIANCE, INC., provided C/TPA and MRO services for industries regulated by the DOT. The defendant established a MRO account with various drug testing laboratories listing Dr. A.P. as the MRO working at the address for WORKPLACE COMPLIANCE, INC., in Winston- Salem, North Carolina, in the Middle District of North Carolina. In fact, Dr. A.P. lived in Texas and did not serve as MRO for WORKPLACE COMPLIANCE, INC., and was not even certified as a MRO.

### Count One

On or about May 13, 2005, for the purpose of executing a scheme to defraud, MICHAEL R. BENNETT transmitted or caused to be transmitted in interstate commerce, from Winston-Salem, North Carolina, to the State of California, that is by electronic mail or facsimile, a purported MRO report for employee 3118 prepared for InfoLink. The latter is a background screening company who employed WORKPLACE COMPLIANCE, INC., to provide drug screening services.

The MRO report provided to InfoLink listed Dr. A.P. as the medical review officer. The report also contained a statement that "This controlled substances test was conducted in accordance with 49 C.F.R. 40." In fact, Dr. A.P. did not receive and review the lab test for this employee and no MRO ever reviewed the test result.

### Count Fourteen

On or about April 11, 2008, for the purpose of executing the scheme and artifice to defraud, MICHAEL R. BENNETT transmitted or caused to be transmitted in interstate commerce,

3

from Winston-Salem, North Carolina, to the State of Texas, that is, by electronic mail or facsimile, a purported MRO report for employee 5233 prepared for Hughes Trucking Company. The latter was an employer who hired WORKPLACE COMPLIANCE, INC., to provide drug screening services. The MRO report provided to Hughes Trucking listed Dr. A.P. as the medical review officer. The report contained an electronic signature of Dr. A.P. The report also contained a statement that "This controlled substances test was conducted in accordance with 49 C.F.R. Part 40." In fact, Dr. A.P. did not receive and review the lab test for this employee and no MRO ever reviewed the test result.

**Count Fifteen**

On or about September 4, 2008, for the purpose of executing the scheme to defraud, MICHAEL R. BENNETT transmitted or caused to be transmitted in interstate commerce, from Winston-Salem, North Carolina, to the State of California, that is, by electronic mail or facsimile, a purported MRO report for employee 5864 prepared for Kroll Background America. The latter was a background screening company who employed WORKPLACE COMPLIANCE, INC., to provide drug screening services. The MRO report provided to Kroll listed Dr. A.P. as the medical review officer. The report also indicated that the substances test was conducted in accordance with 49 C.F.R. Part 40. The report also noted that "Donor provided extensive list of medications. None contributed to the POS result for THC." In fact, Dr. A.P. did not review the lab test and no MRO ever reviewed the test.

**Count Twenty-One**

On or about February 12, 2009, an employer in Dallas, Texas, was undergoing an inspection by the Federal Aviation Administration. An employee of Jet Professionals requested that Bennett provide her with a copy of the MRO certificate of the MRO utilized by WORKPLACE COMPLIANCE, INC., so that she could furnish the document to FAA inspectors. Bennett sent an email to the office containing a bogus MRO certificate for Dr. A.P. which falsely indicated that Dr. A.P. was certified by the American Association of Medical Review

Officers (AAMRO). In fact, AAMRO had no record for Dr. A.P. and Bennett had created the MRO certificate.

(Docket Entry 5, Factual Basis; Docket Entry 59 at 3, 21-22.)

After the Court accepted Petitioner's guilty plea, Petitioner was sentenced to twenty-two months imprisonment. (Docket Entry 35; 8/30/10 Minute Entry.) Petitioner appealed and the Fourth Circuit Court of Appeals affirmed Petitioner's convictions as follows:

> The Government charged Bennett based on his scheme to defraud employers and background screening companies of money and property by misrepresenting to those victims that he and his company, Workplace Compliance, Inc. ("WCI"), provided drug testing services in compliance with U.S. Department of Transportation ("DOT") regulations. Specifically, Bennett and WCI fraudulently purported to provide drug testing services to employers covered by DOT regulations 49 C.F.R. §§ 40.1-.413 (2010). Those regulations require that covered workers submit to drug screening reviewed by a licensed physician trained in substance abuse and designated as the Medical Review Officer ("MRO"). 49 C.F.R. §§ 40.3 and 40.121. Under the regulations, if a drug screening returns a non-negative result, the MRO receives the result, interviews the worker, and determines whether the result indicates illicit drug use. Here, the doctor identified as the MRO for WCI neither held certification as an MRO nor acted as MRO for WCI. Rather, Bennett—who is not a physician—reviewed drug screenings and performed all duties required of the MRO.

. . . .

> The Guidelines direct courts to determine a defendant's offense level for fraud commensurate with the amount of loss involved in the fraud. *See U.S. Sentencing Guidelines Manual* ("USSG") § 2B1.1(b)(1) (2009). In the presentence investigation report ("PSR"), the probation officer added twelve levels to Bennett's offense level based on the total provable loss to victims of $337,030. With a total offense level of eighteen and a criminal history category of I, Bennett earned a Guidelines range of twenty-seven to thirty-three months of imprisonment. USSG ch. 5, pt. A (sentencing table). The probation officer

5

calculated restitution of $398,335 based on the amount of loss attributable to fifteen specific victims. Bennett noted an objection only to the amount of restitution. At the sentencing hearing, the district court spent considerable time resolving the restitution issue, then imposed a below-Guidelines sentence of twenty-two months, and $209,030 in restitution.

On appeal, Bennett asserts that the district court committed procedural sentencing error in its calculation of loss and therefore erred in establishing his recommended Guidelines range. He contends that because some of the drug testing he contracted to perform did not require DOT compliance, victims did not suffer a loss as to those tests. Bennett concedes that under USSG § 2B1.1, loss may be actual, intended, or estimated loss to victims, or gain to defendant. USSG § 2B1.1 cmt. n. 3(A), (B). He asserts that in this instance, loss is only the financial gain he received for DOT-regulated testing that he failed to provide. Bennett further argues that because the Government failed to submit evidence denoting what quantum of testing was DOT-regulated as compared to unregulated, the district court had no factual basis on which to base its loss calculation for purposes of determining his offense level.

. . . .

We are persuaded by the Government's brief that . . . this case is controlled by USSG § 2B1.1 cmt. n. 3(F)(v)(I). That application note directs that, "[i]n a case involving a scheme in which services were fraudulently rendered to the victim by persons falsely posing as licensed professionals," "loss shall include the amount paid for the . . . services . . . rendered with no credit provided for the value of those . . . services." Here, Bennett posed as a doctor in purporting to provide the services of an MRO. Therefore, he is not entitled to [a] reduction . . . . *See United States v. Kieffer*, 621 F.3d 825, 834 (8th Cir. 2010) (applying USSG § 2B1.1 cmt. n. 3(F)(v)(I) to defendant who posed as licensed attorney).

Accordingly, we conclude the district court did not plainly err when it adopted the PSR's calculation of loss for purposes of determining Bennett's offense level. We therefore affirm Bennett's conviction and sentence. . . .

*U.S. v. Bennett*, No. 10-5053, 2011 WL 2515962, *1-2 (4th Cir. June 23, 2011) (unpublished).

## Petitioner's Claims

The Motion raises seven Grounds: (1) trial counsel was ineffective for not making known to the Court "the presence of [his] relationship with any of the three MROs" and did not contact those MROs, (2) counsel was ineffective for failing to provide to the Court the number of DOT and non-DOT tests involved and thus challenging the loss amount at sentencing, (3) trial counsel was ineffective for persuading Petitioner to plead guilty with the understanding that Petitioner would be able to contest the loss amount at sentencing, but then failing to argue loss on his behalf at sentencing, (4) trial counsel and co-counsel provided ineffective assistance because trial counsel failed to appear at sentencing and argue loss, and because co-counsel only argued restitution at sentencing, (5) trial counsel was ineffective for failing to object to loss calculations as to any conduct prior to 2005, (6) trial counsel was ineffective because the MRO listed on the Change of Custody Control Form did not have to be the same MRO that received the result, and (7) trial counsel was ineffective because "not one witness was called to prove that [Petitioner] did not represent [himself] as an MRO." (Docket Entry 87, § 12.) As explained in greater detail below, Petitioner has failed to demonstrate that he is entitled to any relief.

## Discussion

Petitioner's claims all assert ineffective assistance of counsel. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. *See Strickland v. Washington*, 466 U.S. 668, 688, 691-92

7

(1984). A petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994). With regard to prejudice following a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would not have pled guilty but would have gone to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). This determination is an objective one which is "dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007). With regard to prejudice at sentencing, a petitioner must show a reasonable probability that he would have received a more lenient sentence but for counsel's errors. *See Glover v. United States*, 531 U.S. 198, 202–04 (2001); *United States v. Russell*, 34 F. App'x 927, 928 (4th Cir. 2002) (unpublished). Petitioner is not entitled to a hearing based upon unsupported, conclusory allegations. *See Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992) (in order to obtain an evidentiary hearing a habeas petitioner must come forward with some evidence that the claim might have merit), *abrog'n on other grounds recog'd, Yeatts v. Angelone*, 166 F.3d 255 (4th Cir. 1999).

Further, where, as here, "a defendant is represented by counsel when making his guilty plea, that plea is presumed valid when later attacked in a habeas corpus proceeding. [T]o rebut that strong presumption of validity, the defendant must make a factual showing that his plea of guilt was not voluntary and intelligent." *United States v. Custis*, 988 F.2d 1355, 1363 (4th Cir. 1993) (citations omitted). "[S]tatements of fact by a defendant in Rule 11 proceedings may not ordinarily be repudiated, and, similarly, findings by a sentencing court in accepting a plea constitute a formidable barrier to attacking the plea." *United States v. Wilson*, 81 F.3d 1300, 1308 (4th Cir. 1996) (citations, quotes marks omitted). Absent

"extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005.)

**Ground One**

Petitioner first contends that counsel was ineffective for not making known to the Court the "relationship with any of the three MROs" and did not contact those purported MROs—Dr. Polk, Teynor, and Bernstein. (Docket Entry 87, § 12, Ground One.) Petitioner contends that Drs. Teynor and Bernstein should have been interviewed by trial counsel "to refute the prosecutor's claim that [Petitioner] never employed an MRO." (Docket Entry 101 at 2.)

Petitioner's *Strickland* claim lacks merit. As noted, Petitioner plead guilty to Counts One, Fourteen, Fifteen, and Twenty-One. At Petitioner's Rule 11 Colloquy he stated under oath that he read the Factual Basis and agreed with its contents. (Docket Entry 59 at 22.) The Factual Basis indicated that no MRO received the test results referenced in Counts One, Fourteen, and Fifteen. (Docket Entry 5.) As to Count Twenty-One, the Factual Basis indicates that Petitioner emailed a "bogus MRO certificate" to a customer. (*Id.*)

As set out previously, Petitioner faces the "formidable barrier" of his sworn statements made during the plea colloquy, which he can only overcome by demonstrating "extraordinary circumstances." Petitioner's unsupported and conclusory allegations that he utilized MRO's in some capacity or that he did not intent to defraud his customers are not

9

extraordinary circumstances. Petitioner is bound by his statements made during the plea colloquy. Petitioner's *Strickland* claim should be denied on these grounds alone.

Also, the counter-narrative Petitioner provides in his Motion further undermines his claim because he concedes (1) Dr. Polk was not a certified MRO, (2) that despite this Petitioner "continue[d] to list Dr. Polk on the Custody and Control Forms," (3) that test results were transmitted directly to Petitioner's "system," (4) that Petitioner held himself out as an "MRO assistant" while essentially conducting employee interviews, and (5) that his relationship with Dr. Teynor—a purported MRO—did not make "a full transition to the fully DOT compliant system [until] February of 2009." (Docket Entry 87 at 11-20.) Petitioner has thus failed to demonstrate that trial counsel was deficient for failing to further investigate Petitioner's alleged relationship with various MROs or to raise them with the Court. Nor are these allegations sufficient to demonstrate that Petitioner suffered any resulting prejudice, or that but for the purported errors, Petitioner would have gone to trial or received a more lenient sentence.

Finally, at Petitioner's sentencing hearing, he stated that he had reviewed the PSR with his counsel and was satisfied he understood the PSR. (Docket Entry 49 at 42-44.) The trial court then adopted the PSR without objection, including its factual findings, except for an unrelated restitution finding which the PSR was amended to reflect. (*Id.*) The PSR indicates that Dr. A.P. advised that he never held a MRO certificate, never gave Petitioner permission to use his name, and was never paid by Petitioner. (PSR ¶ 20). Not only did the Petitioner falsely list Dr. A.P. on MRO reports, Petitioner established MRO accounts with drug testing laboratories in the name of Dr. A.P. even though Dr. A.P. did not serve as a

10

MRO for the Petitioner's company and was never certified as a MRO. (PSR ¶ 9). Petitioner's assertions to the contrary are conclusory and he has pointed to nothing on the record suggesting the trial court erred in adopting the factual narratives set forth in the Factual basis or PSR. This claim meets neither prong of *Strickland* and should be denied.

**Ground Two**

Petitioner next argues that counsel was ineffective for failing to provide to the Court the number of DOT and non-DOT tests involved and thus challenging the Guidelines loss amount at sentencing. (Docket Entry 87, § 12, Ground Two.) The undersigned finds the Government's argument on this point persuasive, however. As explained above, Petitioner challenged the district court's Guidelines loss calculation on direct appeal on precisely this issue. (Case No. 10-5053, Docket Entry 27 at CMECF Page 16 (faulting the Government for not providing "the breakdown of DOT versus non-DOT tests conducted by defendants for each victim listed in the PSR.").) The Fourth Circuit held the loss amount was controlled by U.S.S.G. 2B1.1 note 3(F)(v)(I) which states that:

> in a case involving a scheme in which services were fraudulently rendered to the victim by persons falsely posing as licensed professionals . . . loss shall include the amount paid for the . . ., services . . . , rendered . . . , with no credit provided for the value of those . . . services.

*Bennett*, 2011 WL 2515962, *2 (citing note 3(F)(v)(I)).[1]

The Fourth Circuit stated further that Petitioner "posed as a doctor in purporting to provide the services of an MRO. Therefore, he is not entitled to the reduction applied in

---

[1] For this reason, any argument that trial counsel prevented this issue from being considered on appeal is also without merit.

11

*Dawkins.*" *Id.*[2] Petitioner cannot now relitigate issues fully considered on direct appeal. *United States v. Boeckenhaupt*, 537 F.2d 1182 (4th Cir. 1976). And, if Petitioner could raise this issue anew here, the undersigned would reach the same conclusion articulated above by the Fourth Circuit for the same reasons. This claim meets neither prong of *Strickland* and should be denied.

### Ground Three

Petitioner next asserts that counsel was ineffective for persuading him to plead guilty with the understanding that he would be able to contest the loss amount at sentencing, but then failing to argue loss on his behalf at sentencing. (Docket Entry 87, § 12, Ground Three.) Petitioner asserts that counsel "believed probation was a very likely outcome" at sentencing and that this is why he agreed to plead guilty. (*Id.* at 18.) Petitioner's Reply also asserts that counsel "expressed confidence they could argue loss to a level low enough to receive probation and not an active sentence." (Docket Entry 101 at 2.)

This argument fails for at least three reasons. First, while trial counsel did successfully argue to the Court for a below Guidelines sentence at sentencing, counsel did not specifically argue loss. (Docket Entry 49 at 59-61.) Yet, as explained, the Fourth Circuit concluded that Petitioner was accountable for loss purposes for all amounts obtained from clients to whom he misrepresented the existence of an MRO. Trial counsel cannot be deficient for failing to raise an argument ultimately lacking in merit.

---

[2] In *United States v. Dawkins*, 202 F.3d 711, 715 (4th Cir. 2000), the Fourth Circuit, in a disability case, held loss was limited to the fraudulent benefit obtained and not the full amount of payment.

Second, Petitioner was not prejudiced by the representations attributed to trial counsel. This is because at his change of plea hearing, Petitioner indicated under oath to the trial court that no one had made any threats or promises other than those in the plea agreement in an effort to get him to plead guilty. (Docket Entry 59 at 9.) The trial court also went over the maximum penalties that could be imposed in Petitioner's case, Petitioner indicated that he understood the maximum possible penalties, and Petitioner acknowledged that the ultimate sentence the Court imposed "may be different from any estimate that any attorney may have provided." (*Id.* at 10-13.) Consequently, Petitioner had no reason to believe that counsel's predictions regarding the length of his sentence were anything other than estimations, nor can Petitioner argue that his guilty plea was not entered into knowingly and willfully.[3] *See United States v. Foster*, 68 F.3d 86, 88 (4th Cir.1995) (recognizing that "any misinformation [defendant] may have received from his attorney was corrected by the trial court at the Rule 11 hearing, and thus [defendant] was not prejudiced").

Third, Petitioner has failed to demonstrate any likelihood that but for trial counsels' purported representations, he would not have pled guilty and instead would have gone to trial. Had Petitioner gone to trial, it is likely the Government would have proceeded on all twenty-three counts set forth in the Information. Each of the nineteen charges of wire fraud carried a maximum penalty of twenty years. 18 U.S.C. § 1343. Each of the three false statement charges carried a maximum penalty of five years, 18 U.S.C. § 1001, and the single

---

[3] The undersigned also notes in passing that Petitioner was offered the opportunity to speak at his sentencing and did not raise the issue of loss with the Court, even after trial counsel failed to raise it. If Petitioner's guilty plea turned solely on raising the issue of loss at sentencing, as he asserts, one might expect Petitioner to have raised the issue himself. (Docket Entry 49 at 59.)

13

charge of mail fraud carried a maximum penalty of twenty years, 18 U.S.C. § 1341. The record indicates that the evidence against Petitioner was considerable. If convicted, Petitioner faced a potentially lengthy prison sentence. If he went to trial, Petitioner would have also lost his three point acceptance of responsibility. Moreover, if convicted of the extensive fraud scheme with which he was charged, it is questionable whether the trial court would have imposed a below the Guidelines sentence. Petitioner has failed to demonstrate any likelihood that but for the purported errors of trial counsel, he would not have pled guilty and would instead have gone to trial, or that the district court would have imposed a more lenient sentence. This claim meets neither prong of *Strickland* and should be denied.

**Ground Four**

Petitioner next claims his counsel was ineffective because one of his two retained attorneys was not present at sentencing. (Docket Entry 87, § 12, Ground Four.) The Petitioner indicates that as a result, only restitution was discussed and the issue of loss was omitted. (*Id.*) A review of the sentencing transcript reveals that it is true that one of Petitioner's counsel was ill on the day of sentencing but that sentencing proceeded with Petitioner's other experienced counsel. (Docket Entry 49 at 2.) Loss was not argued at sentencing. However, as explained, the issue of loss was fully litigated on a direct appeal. The issue cannot be relitigated here. Additionally, to the extent that this argument overlaps with others addressed herein, it should be denied for the same reasons the other arguments in the Motion are deficient. This claim meets neither prong of *Strickland*.

### Ground Five

Petitioner next seems to allege that trial counsel was ineffective for not contending to the trial court that the loss calculations attributable to him should have excluded acts before 2005 because Petitioner's company was in compliance before 2005. (Docket Entry 87, § 12, Ground Five.) Petitioner also seems to attack his conviction by asserting that he was not responsible for any loss at all, that he utilized MRO's, that he was in compliance with DOT regulations, and that counsel was ineffective for not demonstrating all this to the Court. (*Id.*; Docket Entry 101 at 2-3.)

Yet, as explained, Petitioner pled guilty to Counts One, Fourteen, and Fifteen which alleged the scheme began in 2000 when Petitioner moved his company to North Carolina and established fraudulent MRO accounts with drug testing labs. (Docket Entry 1, Counts One, Fourteen, and Fifteen.) Petitioner also plead guilty in Count Twenty-One to emailing a bogus MRO certificate. (*Id.*, Count Twenty-One.) Those Counts also alleged that the scheme to defraud continued until discovered in February 2009. (*Id.*) Petitioner testified under oath at his Rule 11 hearing that he was guilty of these Counts and Petitioner has failed to demonstrated "extraordinary circumstances" that would permit him to overcome his sworn statements made at his change of plea hearing. (Docket Entry 59 at 18-22.)

Moreover, the trial court also adopted as findings of fact the following from the PSR. The scheme began in 2000 after Petitioner moved to North Carolina and incorporated his company in North Carolina. (PSR ¶¶ 5, 9.) Petitioner's company never used a certified MRO although the Petitioner advised clients that his company operated in accordance with DOT regulations which mandate the participation of a MRO. (PSR ¶¶ 10, 11.) Pursuant to

15

Fed. R. Crim. P. 32(i)(3)(A), a sentencing court "may accept any undisputed portion of the presence report as a finding of fact." Moreover, even if a defendant objects to a finding in the presence report ("PSR"), in the absence of an affirmative showing that the information is not accurate, the court is "free to adopt the findings of the presence report without more specific inquiry or explanation." *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) (internal quotation marks and alteration omitted). Nothing on record suggests that these findings in the PSR are inaccurate. Thus, even if trial counsel had objected to these statements, there is no reason to believe the trial court would have deemed them unreliable and consequently would have omitted them.

Additionally, Petitioner states in his pleadings that he began contract negotiations with Dr. Teynor to serve as an MRO but this "transition to the fully DOT compliant system" did not happen until February 2009. (Docket Entry 87 at 15). Petitioner states further that Dr. Polk was not a certified MRO. (*Id.*) Consequently, Petitioner's own pleadings tend to undermine his allegation in this regard.

Finally, Petitioner has also failed to demonstrate any likelihood that but for the purported errors of trial counsel, he would not have pled guilty and would instead have gone to trial, or that he would have received a more lenient sentence. This claim meets neither prong of *Strickland* and should be denied.

**Ground Six**

Petitioner next alleges that the MRO listed on the C.C.F. (Change of Custody Control Form) did not have to be the same MRO that ultimately reviewed the testing results. (Docket Entry 87, § 12, Ground Six.) The undersigned agrees with Respondent that this

16

allegation is immaterial because, as described repeatedly herein, Petitioner did not employ any MRO as he admitted in pleading guilty to Counts One, Fourteen, and Fifteen and as reflected in the PSR. Thus, Petitioner's legal representation would not be inadequate for failing to raise an irrelevant point. And, as noted, Petitioner's unsupported and conclusory allegations that he utilized MRO's in some capacity at some point or that he never intended to defraud his customers do not qualify as extraordinary circumstances sufficient to overcome his guilty plea. This claim meets neither prong of *Strickland* and should be denied.

**Ground Seven**

Petitioner's final claim is that "not one witness was called to prove that I did not represent myself as an MRO." (Docket Entry 87, § 12, Ground Seven.) The record demonstrates no reason for trial counsel to call any such witness to so testify. This is because Petitioner plead guilty to several counts where it was alleged that Dr. A.P.'s name was used fraudulently on MRO reports which Dr. A.P. never reviewed or authorized the use of his name. (Docket Entry 1, Counts One, Fourteen, and Fifteen; PSR ¶¶ 9-10). The Factual Basis also stated without objection: "The MRO report provided to Infolink listed Dr. A.P. as the Medical Review Officer." (Docket Entry 5, Count One). The Factual Basis states too that no MRO reviewed the test results but that Dr. A.P.'s name and/or electronic signature appeared on the MRO report. (*Id.*, Counts One, Fourteen, and Fifteen). The Motion also essentially admits to conducting interviews with employees who tested positive, although Petitioner refers to himself as an "MRO Assistant." (Docket Entry 87 at 13). Yet, DOT regulations require that only medical doctors conduct such interviews, because legitimate medical explanations including medications must be evaluated. (Docket Entry 1,

49 C.F.R. § 40.137.) Petitioner also sent false MRO reports, because the MRO reports represent that "This controlled substance test was conducted in accordance with 49 C.F.R. Part 40." (Docket Entry 5, Counts One, Fourteen, and Fifteen; PSR ¶ 11). Petitioner's assertions to the contrary are conclusory and he has pointed to nothing on the record sufficient to undermine any of these findings. This claim meets neither prong of *Strickland* and should be denied.[4]

In the end, Petitioner has failed to demonstrate that any of his claims—which are essentially conclusory and unsupported in nature, as well as contradicted by the Rule 11 colloquy, Factual Basis, and PSR—have merit. He has demonstrated neither ineffective "performance" of his counsel, nor the resulting "prejudice" required by *Strickland*. An evidentiary hearing is unnecessary. Petitioner points to nothing that would justify any form of relief. The undersigned notes further that in addition to the seven claims set forth above, Petitioner has also included in his pleadings roughly a dozen single-spaced typed pages of narrative setting forth his theory of the case. (Docket Entries 87 at 11-20 and 101 at 1.) It is not clear whether Petitioner is attempting to raise additional argumentation in this narrative. Nevertheless, the undersigned has attempted to respond specifically above to all of the variations of Petitioner's claims. To the extent that any have not been specifically discussed,

---

[4] Petitioner has also served his sentence, and period of supervised release, so any error as to the calculation of either is essentially moot. (Docket Entry 104.) *See Spencer v. Kemna*, 523 U.S. 1, 7-8 (1998); *see also Abusada v. U.S.*, Nos. 3:10–cv–295–RJC, 3:08–cr–112–RJC, 2013 WL 5492666, *6 (W.D.N.C. Oct. 1, 2013). Grounds Two, Four, and Five should be denied for this reason as well. However, at least one of Petitioner's claims (Ground Three) asserts that he only plead guilty because counsel told him they would vigorously contest loss at trial, which they failed to do. Thus, there may be some overlap in Petitioner's claims. Consequently, in an abundance of caution, the undersigned has addressed the substance of all Petitioner's claims and found them without merit.

they should still be denied for essentially the reasons set out herein. For the reasons set forth above, this Motion should be denied in its entirety.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Motion to vacate, set aside or correct sentence (Docket Entry 87) be denied and that this action be dismissed.

_____
Joe L. Webster
United States Magistrate Judge

June 18, 2014